# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs October 6, 2009

## STATE OF TENNESSEE v. VINCENT HUNT

**Appeal from the Criminal Court for Shelby County**
**No. 08-06911    Lee V. Coffee, Judge**

---

**No. W2009-00165-CCA-R3-CD   -   Filed April 8, 2010**

---

The Defendant, Vincent Hunt, was convicted by a Shelby County jury of premeditated first degree murder and especially aggravated kidnapping.  The trial court imposed an effective sentence of life plus forty years to be served in the custody of the Department of Correction. In this appeal as of right, the Defendant contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred in its application of enhancement factors in arriving at the forty-year sentence for the especially aggravated kidnapping conviction and in ordering the sentence to be served consecutively to the sentence of life imprisonment for the first degree murder conviction.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P.  3 Appeal as of Right; Judgments of the Criminal Court**
**are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Wilson Jones, District Public Defender; William Robilio, Cliff Abeles (at trial), and Barry W. Kuhn, Assistant Public Defenders, attorneys for the appellant, Vincent Hunt.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; William L. Gibbons, District Attorney General; Ray Lepone and Paul Hagerman, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

# OPINION

The offenses in this case concern the March 1, 2007, shooting death of twenty-seven-year-old Leon Walker, Jr., whose body was found in an abandoned vehicle in a church parking lot on the downtown south side of Memphis. Marvin Hunt testified that he discovered the victim's body slumped over in the front passenger seat of the vehicle in a church parking lot near his home. He opened the driver-side door and observed that the victim was not breathing and that there was blood on his face, clothing, and the interior of the car. He immediately telephoned the police who arrived at the scene within ten minutes.

Leon Walker, Sr., testified that after returning home from work on the afternoon of March 1, 2007, he received a telephone call from one of his son's friends notifying him that his son had been killed. He arrived at the church parking lot and identified his son as the victim of the shooting from a photograph because the victim's body had already been transported from the scene. Mr. Walker testified that he was aware his son had a drug problem and that he did not approve of his conduct. He stated that he had last seen his son at church the previous Sunday, just four days prior to the shooting.

Courtney Bradford testified that he knew the victim through his cousin, Brandon Splunge, who was a friend of the victim. He recalled that he drove to Mr. Splunge's apartment at about 11:30 on the morning of March 1, where the two men smoked marijuana together. Mr. Bradford left the apartment in Mr. Splunge's car to pick-up the victim at another apartment complex. Upon their arrival, the victim was with another individual whom neither Mr. Bradford nor Mr. Splunge had ever met. Mr. Bradford described the individual as tall with dark skin, dreadlocks, and a teardrop tattoo below his left eye. He recalled that the individual made him uneasy because he was a stranger to him. He identified the Defendant at trial as the man with the victim that day. The four men spent the next several hours driving around downtown on the south side of Memphis conducting drug transactions, listening to music, and smoking marijuana. Sometime between 1:00 and 2:00 in the afternoon, Mr. Splunge returned Mr. Bradford to his car so that Mr. Bradford could get ready to go to work.

Brandon Splunge's account of the foursome's activities mirrored the testimony of Mr. Bradford. He testified that after returning Mr. Bradford to his car, the victim moved to the front passenger seat and the Defendant remained in the backseat behind Mr. Splunge. Mr. Splunge testified that during their driving around, he and the victim sold marijuana and crack cocaine to several individuals. He recalled that he had at least four hundred dollars in his pocket from these sales. While on their way to get marijuana from the victim's girlfriend's apartment, Mr. Splunge received a telephone call from his girlfriend who told him she needed the car to pick-up her cousin at school. He told the jury what happened next

-2-

After I got off the phone with her and told Leon that I had to take my girl the car, as I'm riding down Second Street, like a minute or two later, I heard gunshots. I heard two or three gunshots and I see Leon head toward my dashboard with his eyes in the back of – rolled back in the back of his head.

Mr. Splunge turned to shake the victim and his car began to drive toward the ditch. He testified that Defendant "put the gun to my neck and told me to straighten the car up and keep driving before I kill you. Drive until I tell you to stop." Mr. Splunge stated that he begged the Defendant not to kill him because he had children. He recalled that he offered the Defendant all of his money to spare his life.

Mr. Splunge testified that he saw an older model pick-up truck approaching him so he decided to hit the truck so he could flee from his vehicle. He stated that he "swiped" the truck while traveling about twenty to thirty miles per hour and jumped out of his car to get into the bed of the pick-up truck. He looked back to see his car rolling for some time. He recalled that the Defendant could not open the back doors because the child locks were engaged. As he rode in the back of the pick-up truck, he could see the Defendant climbing to the driver's seat while the car continued to roll. He testified that he next saw the Defendant "pulling on off [in the car] with Leon's body."

Mr. Splunge left the bed of the pick-up truck and went to a construction site to use a telephone. He testified that he first called his girlfriend and told her to take their children to her brother's house because the Defendant knew where he lived. He then called a friend who told him to call the police. The construction worker who had come to his aid also called the police. When the police arrived, Mr. Splunge "flagged them" and told them about the shooting. He later identified the Defendant from a photographic array at the police station.

Mr. Splunge testified that he did not really trust the Defendant since they had never met but because the victim had "vouched for" the Defendant, he allowed him to ride around in the car that day. He admitted on cross-examination that the victim was a member of the Gangster Disciples and that the victim regularly carried a gun. He also admitted that he told the police that when he first heard the gunshots, he thought the victim's gun might have gone off in his pocket. He also admitted that the four men had spent the afternoon driving around, dealing marijuana and crack cocaine, and smoking marijuana.

Laporshia Edwards, Mr.Splunge's girlfriend, testified that she called Mr. Splunge at about 2:15 to ask him to bring the car home for her to use to pick-up her cousin at school. She stated that he did not arrive home but called her soon after their initial conversation warning her to take the children and get out of the apartment because the victim had been

killed. She recalled that their car was found later that afternoon with the victim's body inside and that there was some body damage to the driver's side front end of the vehicle.

Mark Thompson of the Memphis Police Department (MPD) responded to the report of a carjacking based upon Mr. Splunge's call to the police. Officer Thompson described Mr. Splunge's demeanor that day as "real nervous like he had just witnessed something bad." He also recalled that Mr. Splunge responded consistently when questioned about the incident and never wavered from his first account of the shooting.

Shelby County Medical Examiner, Dr. Karen Chancellor, testified that the victim suffered two gunshot wounds. One wound to the back left side of his head severed his spinal cord near the base of his skull. The other wound entered at the back left side of the victim's neck and also traveled through the spinal cord to rest in the victim's upper chest cavity. She opined that neither wound had been inflicted at close range based upon the lack of stippling at the entrance wounds. She also testified that the victim would not likely have survived even with medical attention because the wound that rested at the base of his skull rendered him unable to breathe. Dr. Chancellor testified that the toxicology report revealed no presence of cocaine or marijuana in the victim's blood.

Debrita Clark, the Defendant's girlfriend, testified that she dropped the Defendant off at the Corning Village Apartments on the morning of March 1, 2007, so that the Defendant could buy drugs. She stated that the Defendant telephoned her at approximately 2:45 and asked her to pick him up at a nearby McDonald's restaurant. She said that when she arrived, she found the Defendant "breathing hard . . . like something . . . had happened." Later that afternoon, she and the Defendant went to Tunica, Mississippi. Ms. Clark testified that the next day she received a telephone call from her son telling her that the police had been to their home looking for the Defendant. The couple returned to Memphis where Ms. Clark did not see the Defendant for several days because, she testified, he was hiding from the police. At the Defendant's request, Ms. Clark told the police that the Defendant was still in Tunica. She also acknowledged that she had seen the Defendant with a gun before.

Newton Morgan, a Crime Scene Investigator (CSI) with the MPD, testified that he documented the scene at the church parking lot where the victim's body was found. He stated that a small amount of marijuana was discovered in the vehicle and explained the discovery of Swisher Sweet cigarillos as a probable material used to make "blunts" or marijuana cigarettes. He also testified that there was "quite a bit of blood" in the middle console area of the vehicle, on the victim's clothes and on his face.

Marcus Berryman, another CSI with the MPD, testified that he processed the car for evidence. He stated that both cocaine and marijuana were recovered from the car, in addition

to two digital scales of the kind commonly used by drug dealers to weigh product for resale. He said that a bloody shoe print was found in the driver's seat and that he recovered two .40 caliber spent shell casings in the backseat.

MPD Sergeant Anthony Mullins testified that he was assigned to the homicide unit when Mr. Splunge arrived at the station and reported the carjacking and shooting. He testified that the damage to the car and evidence recovered at the scene were consistent with Mr. Splunge's account of the incident. He stated that his investigation of the victim's death focused on the Defendant very early and that an initial attempt to locate the Defendant in Tunica based upon Ms. Clark's statement proved fruitless. Sergeant Mullins began looking for the Defendant at various relatives' homes. The Defendant eventually turned himself in on March 5, 2007. The Defendant told Sergeant Mullins that he was actually outside a relative's apartment during one of their visits and that he turned himself in because he did not want to cause any trouble for his family.

The Defendant testified and explained that he contacted the victim on the morning of March 1, 2007, to purchase a pound of marijuana. He stated that he had eight hundred dollars with him to make the purchase. He related driving around with the other three men that day. After dropping off Mr. Bradford, the Defendant said that they were on their way to get the marijuana when he realized they were traveling in a "location that we w[ere] not supposed to be headed to" and he became nervous. He described that the music was loud, and that he could see the victim and Mr. Splunge making motions toward him in the backseat while they talked, but that he could not hear what they were saying. He asked to be let out of the car but both men ignored him. He testified that the victim said to him "N - - - - r, you know what it is," at which time he realized the victim had a gun. He surmised that the victim was about "to do something" – to "rob [him] and possibly shoot [him] too." The Defendant testified that he "got scared" and "dove over the seat reaching for the gun." He stated that as he and the victim struggled over the gun, "I snatched the gun back and the gun went off." The Defendant testified that Mr. Splunge just said, "F- - k" and dove from the car. He denied threatening Mr. Splunge in any way. The Defendant testified that he had to reach for the steering wheel to keep from hitting the white pick-up truck head on. He said that once he climbed into the driver's seat, he just drove away from Mr. Splunge and left the car, with the victim's body, in a large parking lot.

The Defendant admitted that he had a prior conviction for armed robbery and was released from prison in February 2005. He also acknowledged his previous membership in a gang, the Cripps, but stated that he renounced his affiliation and stopped hanging around its members while in prison. He explained that the teardrop tattoos on his face represented his sorrow over the death of his uncle and grandfather and that the tattoos had no significance to his participation in a gang. Although, on cross-examination, he admitted that the teardrops

sometimes represent that the wearer committed a murder. The Defendant also testified that the Cripps and the Gangster Disciples generally got along. He also admitted that although he owns guns, he leaves them at home and never drove around with them. He stated that he felt "comfortable" with the victim and "had no reason to take a gun."

The Defendant explained that he called his girlfriend for help because he was scared of the police. He took the gun with him and threw it away. Later, at his mother's house, he changed clothes and threw his bloody clothes in a dumpster. The Defendant testified that his aunt had promised him a night stay at one of the Tunica casino hotels and happened to call him that afternoon with a room to stay in so he and Ms. Clark spent the night in Tunica. He stated that he did not tell Ms. Clark what happened but that she was worried about him. The next day, the Defendant received a phone call from his brother, and Ms. Clark received a call from her son telling them that the police were looking for the Defendant. He told Ms. Clark that she needed to go home. She complied and dropped him off at a cousin's house once they returned to Memphis. He admitted that he asked Ms. Clark to tell the police that he was still in Tunica. The Defendant testified that he turned himself in a few days later because he did not want his family bothered any more and because the news reports concerning the shooting were not true. The Defendant claimed that he never wanted to hurt the victim because they were friends and that he often protected the victim.

Ms. Clark testified in rebuttal for the State. She admitted that her previous testimony had not been completely truthful and that she had gone to the district attorneys' office to discuss it with them. In exchange for her rebuttal testimony, the State offered her immunity from prosecution for perjury. Ms. Clark admitted that the Defendant had a gun with him on their way to Tunica on the evening after the shooting. She admitted that the gun was the same gun she had seen the Defendant carry before and that she thought he might have gotten rid of it while they were in Tunica.

Based upon this evidence, the jury convicted the Defendant of premeditated first degree murder and especially aggravated kidnapping as charged in the indictment. The trial court imposed an automatic life sentence with the possibility of parole for the first degree murder count. At a separate sentencing hearing, the trial court sentenced the Defendant to forty years as a Range II offender for the especially aggravated kidnapping count. The trial court also ordered the sentences to be served consecutively based upon its findings that the Defendant possessed an extensive record of criminal activity and qualified as a dangerous offender. See Tenn. Code Ann. 40-35-115(b)(2) and (4). On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the trial court erred in sentencing the Defendant to a forty-year consecutive sentence for the especially aggravated kidnapping conviction.

## ANALYSIS

### *Sufficiency of the Evidence*

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u>; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

### First Degree Murder

A conviction for premeditated first degree murder requires proof that the defendant committed a "premeditated and intentional killing." Tenn. Code Ann. § 39-13-202(a)(1). The first degree murder statute explains the term "premeditation" as follows:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

<u>Id.</u> § 39-13-202(d). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. <u>Bland</u>, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence

of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The evidence at trial shows that the Defendant, suddenly and without provocation, fatally shot the victim in the head and neck. Shell casings from the gun were found in the back seat of the car – the location where all witnesses, including the Defendant, testified the Defendant sat while the men rode around that afternoon. The Defendant abandoned the car with the victim's dead body still inside. He obtained assistance from his girlfriend and family to flee to Tunica and remain a fugitive for several days before turning himself in to the police. He admitted that he disposed of the weapon and his bloody clothes within hours of the shooting. The Defendant argues that the State failed to prove any motive. However, the lack of proof of a motive does not does not affect our sufficiency determination because, "while proof of motive may help prove premeditation or intent, it is not an element of first-degree murder." State v. Stanley Blackwood, No. W1999-01221-CCA-R3-CD, 2000 WL 1672343, at *7 (Tenn. Crim. App. Nov. 2, 2000), app. denied (Tenn. May 21, 2001); see also Tenn. Code Ann. § 39-13-202(a). Furthermore, although the Defendant testified that the shooting was accidental and that the victim threatened him with the gun, the jury chose to accredit the testimony of Mr. Splunge, which was within its province to do. Therefore, we conclude that there was sufficient evidence to support the Defendant's conviction for premeditated first degree murder.

## Especially Aggravated Kidnapping

A conviction for especially aggravated kidnapping requires proof, in relevant part, that a defendant knowingly and unlawfully removed or confined a victim so as to substantially interfere with a victim's liberty and that the act of confinement or removal is accomplished with a deadly weapon. See Tenn. Code Ann.§ 39-13-305(a)(1).

The Defendant argues that his especially aggravated kidnapping conviction violates the holding of State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), because the offense was incidental to the premeditated first degree murder. We agree with the State that the due process concerns discussed in Anthony are not implicated in this case because the especially aggravated kidnapping of Mr. Splunge cannot be characterized as necessary to the completion of the first degree murder of Mr. Walker. The two offenses are factually distinct from one another. Thus, there is no Anthony issue presented in this case.

-8-

The Defendant also contends that the evidence is insufficient because the proof shows that "any confinement lasted only a very brief period before Mr. Splunge jumped from the car." However, "nothing in the especially aggravated kidnapping statutes requires that the victim be removed for a certain distance or be confined for a certain period of time in order for a defendant's actions to amount to a substantial interference with the victim's liberty." State v. Turner, 41 S.W.3d 663, 670 (Tenn. Crim. App. 2000) (citing State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997)), app. denied (Tenn. 2000).

The evidence in this case shows that the Defendant placed a gun to Mr. Splunge's head and ordered him to continue driving the car or risk the same fate as his friend, Mr. Walker. Mr. Splunge testified that he was not able to escape the Defendant until he swiped an oncoming truck with his car and "bailed out" of the vehicle. Therefore, we conclude that the evidence is sufficient to support the Defendant's conviction for especially aggravated kidnapping.

*Sentencing*

The Defendant contends that his consecutive forty year sentence for the especially aggravated kidnapping conviction is excessive. He alleges that the trial court erroneously applied enhancement factors to increase his sentence beyond the minimum of twenty-five years. He also argues that consecutive sentences are excessive in this case because he "is thirty-one years old" and the forty-year sentence is to be served at one hundred percent, thus creating"two life sentences" for his convictions. The State argues that the sentencing decision should be affirmed because it is consistent with the purposes and principles of the sentencing act. Following our review, we agree with the State.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

"However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

[T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

Tennessee's sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In imposing a sentence, the trial court may only consider enhancement factors that are "appropriate for the offense" and "not already . . . essential element[s] of the offense." Tenn.

Code Ann. § 40-35-114. These limitations exclude enhancement factors "based on facts which are used to prove the offense" or "[f]acts which establish the elements of the offense charged." Jones, 883 S.W.2d at 601. Our supreme court has stated that "[t]he purpose of the limitations is to avoid enhancing the length of sentences based on factors the legislature took into consideration when establishing the range of punishment for the offense." State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997); Jones, 883 S.W.2d at 601.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the defendant's potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

## Length of Sentence

The Defendant has prior convictions of attempted second degree murder and aggravated robbery, both Class B felonies. See Tenn. Code Ann. §§ 39-13-210(c), 39-12-107(a) , and 39-13-402(b). Especially aggravated kidnapping is a Class A felony. Tenn. Code Ann. § 39-13-305(b)(1). Thus, the trial court correctly sentenced the Defendant as a Range II offender. See Tenn. Code Ann. § 40-35-106(a)(1). As a Range II offender, the Defendant faced a sentencing range of twenty-five to forty years. Tenn. Code Ann. § 40-35-112(b)(1).

At the sentencing hearing, the trial court imposed a sentence of forty years based upon its finding of two enhancement factors: (1) that the Defendant has a history of criminal convictions or behavior beyond that necessary to establish the range; and (2) that the Defendant had no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-114(1) and (10). The trial court based its findings upon the Defendant's lengthy history of juvenile adjudications beginning at the age of eleven and the Defendant's willingness to fire a weapon in a moving vehicle and threaten the driver – thereby endangering other drivers on the street, specifically the driver of the white pick-up truck with which Mr. Splunge's vehicle collided during his escape. Our review of the record supports the trial court's finding regarding the Defendant's criminal history. We agree with the trial court that the Defendant's record contains many offenses less serious than the ones presented in this case but the sheer number of the convictions indicate "over a long period of time a sustained intent to violate" the law. Likewise, we agree that factor (10) was

appropriately applied in this case given the risk of death posed by the Defendant's actions in a moving vehicle and the actual collision of Mr. Splunge's car with the white pick-up truck. Accordingly, we affirm the trial court's imposition of the maximum forty-year sentence in this case.

With regards to consecutive sentencing, the trial court made specific findings that the Defendant qualified as an offender with an extensive history of criminal activity and as a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(2) and (4); see also, State v.Wilkerson, 905 S.W.2d 933 (Tenn. 1995). The Defendant does not contest the trial court's findings, but only argues that a consecutive forty year sentence to be served at one hundred percent is excessive under the circumstances of this case. The State argues that the trial court is not required to give the Defendant leniency because of his age and the aggregate effect of the sentences. We agree with the State and further conclude that the record supports the trial court's imposition of consecutive sentences. Accordingly, the judgments of the trial court are affirmed.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE